## COMMONWEALTH *vs.* DARREN CASWELL.

No. 12-P-1301.

Plymouth. January 16, 2014. - June 16, 2014.

Present: GRAHAM, BROWN, & MALDONADO, JJ.

*Homicide. Evidence,* Joint venturer. *Joint Enterprise. Practice, Criminal,* Argument by prosecutor, Instructions to jury. *Accessory and Principal. Malice.*

At a murder trial, there was sufficient evidence that the defendant knowingly participated in a joint venture to kill the victim and that he acted with the intent required to commit that crime. [471-473]

At a criminal trial, a statement in the prosecutor's closing argument that a certain witness, whom the defendant alleged had committed the crime charged, had been "vetted" by the grand jury, although improper, had very little, if any, effect on the jury's verdict. [473-475] BROWN, J., dissenting.

A criminal defendant failed to demonstrate that certain statements in the prosecutor's closing argument at trial either contained pure speculation or misstated the evidence. [475-476]

At a criminal trial in which the evidence included an unrecorded custodial police interrogation of the defendant, the judge's decision to instruct the jury regarding the reason or justification for the failure of the police to record the interview, although error, was not prejudicial, where the defendant challenged neither the accuracy nor the voluntariness of the statements he allegedly made during the interrogation [476-478]; further, the judge's error in giving a supplemental instruction on voluntariness did not prejudice the defendant [478-479].

At a murder trial in which the jury rejected the Commonwealth's theory of joint venture premeditated murder and instead convicted the defendant of murder in the second degree, no error arose from the judge's decision not to instruct the jury regarding the defendant's knowledge that the individual who assaulted the victim possessed a weapon. [479]

INDICTMENT found and returned in the Superior Court Department on October 2, 2009.

The case was heard by *Paul E. Troy*, J.

*Cynthia Vincent Thomas* for the defendant.

*Gail M. McKenna*, Assistant District Attorney, for the Commonwealth.

GRAHAM, J. On August 13, 2003, Matthew Cote, the victim, was stabbed to death. His body was discovered several days later in the rear seat of his pickup truck in a remote area of the town of Carver. The truck had been set afire, and the victim's body was severely burned and unrecognizable. More than six years later, Darren Caswell, the defendant, was indicted on a charge of murder in the first degree of the victim, and at trial, the Commonwealth proceeded against him on theories of deliberate premeditation and extreme atrocity and cruelty, based on his knowing participation in the commission of the crime, either alone or with others, and with the requisite intent for murder. See *Commonwealth* v. *Zanetti*, 454 Mass. 449, 466-468 (2009). A Superior Court jury rejected the charge of murder in the first degree, but convicted the defendant of murder in the second degree.

On appeal, the defendant argues that there was insufficient evidence that he participated in a joint venture to murder the victim; that portions of the prosecutor's closing argument were improper; that the judge's jury instruction pursuant to *Commonwealth* v. *DiGiambattista*, 442 Mass. 423, 440-449 (2004), was erroneous; that the judge's instructions on malice were erroneous and incomplete; and that the cumulative impact of the errors denied him a fair trial. We affirm.

The jury could have found the following facts. The victim, who lived in the town of Kingston with his girlfriend, Jessica Brunell,[1] and her young daughter, broke his wrist in 2002 in a motorcycle accident. Thereafter, he became addicted to the drug Oxycontin, which he purchased from Russell Freitas, a resident of the nearby town of Middleboro. Freitas had been involved in an accident in 1998 while "off roading" in a pickup truck, and the accident left him a quadriplegic, confined to a wheelchair. As a result of Freitas's injury, he received cash payments for his disability and an allotment of 100 Oxycontin pills per month to control his pain. He used only a portion of his allotment to control his pain and sold the remaining pills to others, including the victim, at a price of forty dollars per pill.

---

[1]At the time of the victim's murder, his girlfriend's name was Jessica Brunell. At the time of trial, she had married and adopted the last name of Horne.

By the summer of 2003, the victim was indebted to Freitas in the amount of $300. In retaliation for the unpaid debt, the victim was murdered, and his truck was taken to a remote area and burned, with the victim inside the truck's cab. Thereafter, Freitas kept a picture of the burned pickup truck on his computer and occasionally used the picture as a screen saver.

Through witness testimony and collected evidence, the Commonwealth presented the following. On August 10, 2003, at approximately 4:00 P.M., Freitas made a telephone call to his friend Raymond Floyd and, in an agitated state, told Floyd that he was convinced that the victim had broken into his home and stolen drugs and a bracelet. Three days later, between 10:28 A.M. and 3:25 P.M., Freitas made a series of telephone calls to his cousin, Darren Caswell, the defendant. At approximately 2:00 P.M. that day, Freitas called the victim, who was at home with Brunell, and asked him to come to his house that afternoon to install hardwood flooring and to start a dirt bike that had not been started in seven years. Freitas further informed the victim that he had 100 Oxycontin pills that he wanted the victim to sell to several of Freitas's customers.

The victim informed Brunell of the contents of the call and then left home in his green Ford pickup truck at approximately 2:30 P.M. for Freitas's house, which was about a one-half hour drive from his home. At 3:00 P.M., he arrived at Freitas's home, and five minutes later, Jamie Peterson, Freitas's personal care attendant and girlfriend, came to the house to pick up a check.[2] The victim and Peterson spoke for about five minutes, and then she left for the bank.

When the victim did not return home for supper at approximately 6:00 P.M., Brunell tried, unsuccessfully, to reach him on his cellular telephone. She called his telephone several times thereafter, but was still unable to reach him.

At approximately 8:00 P.M. that evening, Floyd received a telephone call from Freitas, who asked for assistance picking up

---

[2]Peterson testified that Freitas generally paid her on Fridays, but had called her that day and insisted that she come to his house and pick up a check for her services. In his closing, the prosecutor argued that the timing of having Peterson come over to pick up her paycheck was orchestrated by Freitas so that Peterson saw the victim alive that day.

someone who was stranded. Freitas did not say the name of that person, and Floyd, who also served as Freitas's driver, reluctantly agreed to assist him. When Floyd arrived at Freitas's house, he discovered that all the house lights and the outdoor sensors were off, and that Freitas's van was parked in the middle of his driveway. Floyd testified that this was very unusual. As Floyd helped Freitas get settled in the van, Freitas instructed him to turn off the overhead dome light.

Once Freitas was securely in place inside his van, he had Floyd stop briefly at a convenience store to buy bottles of water and then instructed him to drive down Plymouth Street through the Middleboro/Carver line toward Route 58 and the town of Plymouth, without informing Floyd of their ultimate destination. As they were traveling, Freitas made a telephone call to the defendant. During the telephone call, Freitas told the defendant to "[m]ake sure the duck is cooked well, well, well done."

Floyd, still uninformed of their destination, made a loop and continued on Route 58 while Freitas made numerous telephone calls, many of which were unsuccessful or "dropped" calls. Freitas became agitated and mumbled to himself, "[I]f you need something done, you need to do it yourself." Floyd continued on Route 58 for about three to four miles and ended up on Tremont Street in Carver. Freitas told Floyd to look for a mailbox with handlebars, and as Floyd drove down Tremont Street, Freitas instructed him to slow down, lower his window, and yell, "[W]here are you?"[3] Floyd continued driving and ended up at the Plymouth Municipal Airport. Freitas then had Floyd loop back onto Tremont Street, while Freitas continually attempted to contact the unidentified person. As they crossed the Plymouth/Carver line, Freitas told Floyd to stop the car. The defendant, dressed in black pants and a long-sleeved black sweatshirt, emerged from behind a guardrail near some cranberry

---

[3]At trial, Floyd testified as follows: "We continue driving down Tremont Street and we drive by the area where he supposedly thinks he might be and, then, we, you know, we slow down, you know, we yell out for him, you know, where are you, you know, and he wanted me to yell out where are you and I didn't know, you know, he didn't give me no name to yell out, but he wanted me to yell out [asking] where he is, where are you, in the woods?"

bogs and ran toward the van.[4] The location where Floyd and Freitas picked up the defendant was approximately one-fifth of a mile from the spot where the victim's body was later discovered, and approximately twelve to sixteen miles from the defendant's home.

Floyd testified at trial that when he opened the driver's-side sliding door, both the defendant and Freitas started "freaking out because the dome light came on." After Floyd drove a short distance, Freitas instructed him to pull to the side of the road and let cars pass because he did not want anyone to take down his license plate. Floyd complied with Freitas's request, letting several cars drive past them before getting back on the road. Once they arrived at Freitas's home, Floyd drove home in his car, and the defendant drove home in Freitas's van.

Meanwhile, Brunell continued calling the victim's telephone, to no avail. The following day, August 14, 2003, she called the victim's father, who informed her that he had not seen the victim, although the victim was supposed to meet him for work that morning. At around noon, Brunell called Freitas and asked if he had seen the victim. Freitas responded that the victim was "up to no good" and probably with another woman.

Later, Brunell went to the Kingston police station and filed a missing person report. Over the course of the next couple of days, Brunell posted "missing person" fliers in Kingston, Middleboro, Carver, Wareham, and Plymouth. The fliers asked anyone with information about the victim to contact her.

On Sunday, August 17, 2003, Floyd drove to Freitas's house for a visit. Prior to visiting Freitas, Floyd made a trip to Middleboro, where he saw several of the missing person fliers posted by the victim's girlfriend. When Floyd arrived at Freitas's home, the defendant was in Freitas's garage working on a car. Shortly after Floyd's arrival, Freitas received another telephone call from Brunell. During the call, Floyd heard Freitas "bad mouth[]" the victim, saying he was a drug dealer, was cheating on her, and was not a nice person.

After Freitas ended the telephone call, his face turned pale

---

[4]Floyd knew the defendant mostly through Floyd's association with Freitas, and had seen him an average of two times a week at Freitas's home.

and he stated to Floyd that the matter of the victim's disappearance was going "to get big." Freitas then told Floyd that if he was contacted by the police he should tell them that on August 13, 2003, he went to a bar and to a Home Depot store.

Also on Sunday, August 17, 2003, at approximately 10:00 A.M., the victim's remains were discovered by Steven Guarino and his brother-in-law. The pair went fishing at a small pond off Tremont Street in Carver. The only path to the pond was a hilly and rocky access road for power lines. On their way to the pond, they noticed a burned pickup truck, but drove past it. However, when they left the pond a few hours later, they stopped and inspected the truck. They noticed an awful smell emanating from inside the truck and, on closer inspection, noticed a body inside the vehicle. The body was completely burned and unrecognizable. Guarino called the Middleboro police and reported the discovery of the truck and remains. The Middleboro police, in turn, contacted the Massachusetts State police.

Francis M. McGinn, a Massachusetts State police captain assigned to the fire investigation unit of the fire marshal's office, responded to the scene. A green Ford pickup truck, located in a grassy area off a dirt road used to access overhead power lines, was completely burned. The remains of the victim's body were located in the rear passenger seat of the truck, pointed toward the driver's side, lying face down. Most of the extremities of the body were burned to the bone; hanging around the bones of the neck was a heavy silver chain. Most of the remains consisted of the main torso. There was also a blue motor cycle helmet on the floor of the passenger seat. After investigation, including the use of a dog trained to detect ignitable liquids that might be used in igniting a fire, the fire marshal determined that the origin of the fire was in the cab of the truck and that the fire was set purposefully.

Later that day, the Carver police contacted Brunell and asked her whether she could identify the heavy silver chain the State police had removed from the remains of the charred body in the pickup truck. She identified the chain as the one worn by the victim when she last saw him on August 13, 2003.[5]

---

[5]The victim had been identified previously through dental records.

An autopsy was later performed on the remains of the victim. The autopsy revealed that the victim's body was incinerated after he died from a series of puncture wounds to his internal organs that caused extensive internal bleeding. Three to five wounds went directly to his heart, one to the left lung, and two to his stomach area. The weapon used was consistent with a knife or a screwdriver with a beveled point.

On Monday, August 18, 2003, Floyd saw a headline in the Brockton Enterprise newspaper stating that the victim had been killed and his body recovered. The following day, Floyd went to the police and informed them of the incident with the defendant and Freitas in the evening of August 13, 2003. With the police, he retraced the route he had taken with Freitas on August 13, 2003, pointing out the location where they had picked up the defendant that evening.

Following Floyd's disclosures, Detective David Mackiewicz, Trooper Debra Lilly, and Trooper Scott Warmington interviewed the defendant at the Marlboro police station. The defendant signed a waiver of Miranda rights and agreed to speak to the officers. He informed them that he and Freitas were cousins and that he had been a correction officer at a State facility, but had been out injured for a year at that point. When asked if he knew the victim, the defendant replied that he had known the victim for approximately a year, had seen him three or four times, and had last seen the victim on July 4, 2003, at a party at Freitas's house. Trooper Lilly then asked the defendant if he could tell them what his activities were on August 13, 2003.

The defendant told the troopers that on the morning of August 13, 2003, he reported for jury duty at the Brockton Superior Court and was released at noontime. He returned home and, from approximately 1:00 P.M. until 3:00 P.M., spent time at home with his friend and fellow correction officer Michael MacNeil. He stated that he remained at home until 8:00 P.M., when he went to a bar and restaurant in Halifax, and denied having seen Freitas that evening.

Trooper Lilly also asked the defendant if he knew Kenneth Floyd. The defendant replied that he did know someone named "Kenny" as a person who frequently went over to Freitas's home and assisted Freitas with daily chores. He also claimed

that he had last seen Floyd two weeks prior to the interview. At that point, Trooper Warmington informed the defendant that the State police had cellular telephone tower information that placed the defendant within one-half mile of the scene where the victim was found in his truck, and that they had information from Floyd that he and Freitas had picked up the defendant at approximately 9:00 P.M. on August 13, 2003, less than one-quarter of a mile from the spot where the victim's body was found. The defendant stated that he did not know what Trooper Warmington was talking about and insisted that he was not near the location where the victim's body was found.

Trooper Warmington pressed the defendant, asking him what happened that led to the victim's death, and the defendant again insisted that he did not know anything about it and stated, "I didn't kill him. I don't know what happened." Trooper Warmington then asked the defendant if he knew ahead of time that the victim would be killed. The defendant denied any such knowledge. Finally, the trooper asked the defendant whether there had been some kind of fight over money or drugs that got out of hand and resulted in the victim's death. The defendant responded, "That's not how it happened. I didn't know ahead of time that this kid was going to be killed." At that point the interview ended. The defendant was allowed to leave the police station. He later returned to work as a correction officer.

In 2006, Freitas died. The investigation into the victim's death languished until late 2007 or early 2008. At that time, the investigative record of the case was sent to the State police fusion center in Framingham as a cold case. The fusion center was responsible for organizing the information collected by the State police and making a chart that disclosed the relationship and connections among the evidence collected. The telephone records of the victim, Freitas, the defendant, and Michael MacNeil were reviewed by Sergeant Anna Brookes, a veteran trooper. She prepared a chart that outlined the telephone calls and identified the callers for the period of August 12, 2003, through August 14, 2003.

The records revealed that on August 13, 2003, between 10:28 A.M. and 3:25 P.M., the defendant engaged in a series of eighteen telephone calls with Freitas, and another series of shorter

telephone calls with Freitas between 6:03 P.M. and 9:22 P.M. that evening. In addition, the records revealed that also on that date, the defendant had spoken to MacNeil by telephone four times between 9:49 A.M. and 6:40 P.M. in Massachusetts. The records further showed that MacNeil then called the defendant four times the following day from Pennsylvania between 1:54 P.M. and 8:18 P.M. Those telephone calls were followed by a series of telephone calls by MacNeil to the defendant from Pennsylvania on August 15, 2003, and from New Jersey, Connecticut, and Massachusetts on August 16, 2003.

Based, in part, on the web of telephone calls, including the frequency and locations of the telephone calls, the police settled on a theory that the defendant, Freitas, and MacNeil were involved in the murder of the victim.

At trial, the defendant did not testify and, instead, relied on cross-examination of the Commonwealth's witnesses to undercut their credibility, raise doubts about the adequacy of the police investigation, and pursue a third-party culprit theory. The defendant presented three witnesses to bolster his theory that a third party, Joseph Pedro, who was incarcerated for burglary convictions at the time of trial, was the real culprit. Those witnesses testified that, shortly after the victim was killed, Pedro made statements to other people that he was the one who killed the victim. Pedro testified at trial and denied playing a role in the victim's death.

*Discussion.* 1. *Motion for required finding of not guilty.* The defendant moved for a required finding of not guilty at the close of the Commonwealth's case, and again at the close of all the evidence. He claims that his motion was improperly denied, because there was insufficient evidence that he knowingly participated in a joint venture to kill the victim or that he acted with the intent required for the crime.

In reviewing the denial of a motion for a required finding of not guilty, we "determine whether the evidence, in its light most favorable to the Commonwealth, notwithstanding the contrary evidence presented by the defendant, is sufficient . . . to permit the jury to infer the existence of the essential elements of the crime charged. . . . [T]he evidence and the inferences permitted to be drawn therefrom must be 'of sufficient force to

bring minds of ordinary intelligence and sagacity to the persuasion of [guilt] beyond a reasonable doubt . . . .' " *Commonwealth* v. *Latimore*, 378 Mass. 671, 676-677 (1979), quoting from *Commonwealth* v. *Cooper*, 264 Mass. 368, 373 (1928).

The defendant was convicted of murder in the second degree on the theory of joint venture. Under the reformulated test announced in *Zanetti*, 454 Mass. at 466-468, "When there is evidence that more than one person may have participated in the commission of the crime . . . the defendant is guilty if the Commonwealth has proved beyond a reasonable doubt that the defendant knowingly participated in the commission of the crime charged, alone or with others, with the intent required by that offense." *Id.* at 467-468 & n.22.

The defendant first argues that the Commonwealth failed to prove his participation in the crime and, instead, proved only that he was present in the general vicinity where the body was discovered, and that certain statements made by him were inconclusive and provided evidence only of consciousness of guilt. We disagree. While mere presence at the commission of a crime is insufficient to establish joint venture liability, see *Commonwealth* v. *Perry*, 432 Mass. 214, 223 (2000), the Commonwealth's evidence, and reasonable inferences permissibly drawn from that evidence, established the defendant's participation in the joint venture.

Crediting the version of the evidence that favors the Commonwealth, the defendant admitted to the police that he was at the scene when the victim was killed and made various statements to the police that were untrue, thus demonstrating a consciousness of guilt. In addition, he was picked up by Floyd and Freitas on the night the victim was killed wearing all-black clothing and emerged from behind a guardrail near cranberry bogs less than one-quarter of a mile from where the victim's body was discovered. The defendant also exchanged numerous telephone calls with Freitas in the morning and early afternoon of August 13, 2003, shortly before and after the victim was killed, permitting the jury reasonably to infer that he participated in the planning of the crime. Moreover, the jury reasonably could have concluded that, because Freitas was a quadriplegic, Freitas could not have inflicted the wounds that caused the

victim's death, and that the fatal blows were struck by the defendant, Freitas's cousin and close friend. Thus, the jury reasonably could have inferred not only that the defendant was present at the time of the victim was killed, but also that he intentionally participated in some fashion in committing the crime.

Second, the evidence was clearly sufficient to establish that the defendant had or shared the intent required to commit the crime. To sustain a conviction, the Commonwealth had to prove that the defendant participated in the unlawful killing of the victim, and did so with malice.

Malice is defined, under these circumstances, as an intent to cause death, to cause grievous bodily harm, or to do an act that, in the circumstances known to the defendant, a reasonable person would have known created a plain and strong likelihood that death would follow. See *Commonwealth* v. *Perry*, *supra* at 219, 220. "The jury may infer the requisite mental state from the defendant's knowledge of the circumstances and subsequent participation in the offense." *Commonwealth* v. *Soares*, 377 Mass. 461, 470, cert. denied, 444 U.S. 881 (1979).

Here, the victim suffered multiple stab wounds to his heart and chest, and then was left to die. Such evidence was sufficient to establish all three prongs of malice. See *Commonwealth* v. *Murphy*, 426 Mass. 395, 400-401 (1998) (participating in stabbing individual in heart and chest sufficient evidence of all three prongs of malice); *Commonwealth* v. *Serino*, 436 Mass. 408, 417 (2002) (malice shown where injuries indicate intent to cause death).

2. *Prosecutor's closing argument.* The defendant also challenges three portions of the prosecutor's closing argument as improper. The only challenged remarks to which the defendant raised a timely objection was the prosecutor's claim that Pedro, the defendant's alleged third-party culprit, was "vetted" by the grand jury, thereby suggesting that Pedro was thoroughly and diligently investigated by the grand jury and, by implication, that he was not involved in the murder.

We review the prosecutor's closing argument in its entirety, in the context of the jury instructions and the evidence at trial. See *Commonwealth* v. *Cosme*, 410 Mass. 746, 750 (1991), and

cases cited. "Counsel may argue from the evidence and may argue fair inferences that might be drawn from the evidence." *Commonwealth* v. *Murchison*, 418 Mass. 58, 59 (1994).

We place the prosecutor's remarks in context. In his closing argument, defense counsel argued, among other things, that the police failed to conduct a proper investigation of the murder. He stated:

> "[H]ow appalled were you by this investigation? . . . This is an investigation. This is an investigation. The Government has an obligation to investigate. They didn't investigate anything. Joey Pedro, like I said, well, what did you do? I said did you kill Matthew Cote? No. Okay, thank you. Sorry to bother you. Then [the officer] goes to serve the subpoena on him and stands on his front porch. Basically he tells her to take a hike again. I'm not answering any questions."

The prosecutor responded to those remarks as follows:

> "Now, before I walk through that evidence with you, I'd like to talk about Joe Pedro . . . . As you well know by now there was a grand jury who heard evidence in this case. Every single witness who had something to do with Pedro in this trial testified and *was vetted by that grand jury*. [Those witnesses] and none other than Joe Pedro himself all testified before the grand jury. This wasn't something that the police or the DA's office just blew off, ladies and gentlemen, just ignored because it was convenient. This was something that was looked into diligently and thoroughly."

(Emphasis supplied.) Defense counsel objected to those remarks, arguing, "[W]e know the grand jurors don't vet anything. The District Attorney brings people in, they testify and they return an indictment. So there's no indication that every single witness who testified was fully vetted by that grand jury. So I object to that. No confrontation, no cross-examination as we all know well." The judge overruled the objection, stating, "As far as vetted, . . . I think it was fair game for the argument . . . ."

The Commonwealth claims that the prosecutor's remarks

were proper because the lay definition of "vetted" means investigated, not cross-examined. We disagree. Merriam-Webster's Collegiate Dictionary 1396 (11th ed. 2003) defines "vetted" as "to subject to usu[ally] expert appraisal or correction"; "to evaluate for possible approval or acceptance."

By using the word "vetted," the prosecutor improperly invited the jury to rely on the prestige of the grand jury process to support an argument that the issue of the third-party culprit, Pedro, was closely examined. See *United States* v. *Torres-Gaindo*, 206 F.3d 136, 142 (1st Cir. 2000) ("While not vouching in the most familiar sense, [the prosecutor's argument] does invite the jury to rely on the prestige of the government and its agents rather than the jury's own evaluation of the evidence; to this extent, the argument presents the same danger as outright vouching").

We are convinced, however, that the error had very little, if any, effect on the jury's verdict for two reasons. First, the overall point of this portion of the prosecutor's argument was that the issue of Pedro's involvement in the crime was explored by the police. Second, the error was mitigated by the prosecutor's attempt to give that word context by specifically discussing the testimony of each of the witnesses connected with Pedro.

The defendant additionally argues that the prosecutor's argument of the facts surrounding the victim's death was not based on the evidence or reasonable inferences therefrom but, rather, included "pure speculation to compensate for the glaring holes in the Commonwealth's case." We disagree. The defendant correctly notes that the Commonwealth failed to present evidence regarding the actual events between the time the victim was last seen at Freitas's house at approximately 3:00 P.M. and the time the defendant was picked up by Floyd and Freitas at 9:22 P.M. that evening.

In his closing argument, the prosecutor acknowledged to the jury that he could not prove exactly how the killing occurred and, properly, suggested a theory of the crime that was based on the testimony of the witnesses, contemporaneous telephone records, the defendant's admissions, and the inferences reasonably drawn from the defendant's relationship with Freitas and Freitas's profound disabilities. Based on this evidence, and on reasonable inferences that could be drawn fairly from it, the prosecutor's

argument was proper. See *Commonwealth* v. *Pope*, 406 Mass. 581, 587 (1990).

Finally, the defendant argues that the prosecutor misstated the evidence in his closing when he told the jury that the defendant called and spoke to MacNeil after the defendant's interview with the police on September 3, 2003.[6] The defendant argues that while there were two telephone calls noted in MacNeil's telephone records to the defendant's cellular telephone number, the defendant was not in possession of his telephone at that time, because it had been seized by the police. There is no evidence in the record to support that argument. Moreover, were we to assume the defendant was correct on this point, the error clearly did not constitute a substantial risk of a miscarriage of justice.

3. *DiGiambattista instruction.* The defendant's interview with Detective Mackiewicz and Troopers Lilly and Warmington was not recorded. Instead, the troopers took notes and later wrote a report of the key aspects of the interview.[7]

Prior to the final charge conference, defense counsel requested that a *DiGiambattista* instruction be given.[8] See *Commonwealth* v. *DiGiambattista*, 442 Mass. 423 (2004). The judge agreed to

---

[6] The prosecutor argued, "Again, September 3rd, Caswell is interviewed by the State police, 6:15 P.M., right after the interview would have ended, he talked to MacNeil twice. Think about that."

[7]    *Q.*: "Trooper Lilly, you were asked about the recording of interviews. Was it your policy to record interviews with witnesses or suspects back in 2003?"

   *A.*: "No, it wasn't."

   *Q.*: "At some point were you aware of a change in the law here in Massachusetts in 2004 with respect to recordings?"

   *Q.*: "What happened in 2004?"

   *A.*: "I believe the [Supreme Judicial Court] made a ruling that it was strongly recommended that we record suspects if they're in a police facility."

[8] In *DiGiambattista*, the Supreme Judicial Court, pursuant to its supervisory powers, held that "[W]hen the prosecution introduces evidence of a defendant's confession or statement that is the product of a custodial interrogation or an interrogation conducted at a place of detention (e.g. a police station), and there is not at least an audiotape recording of the complete interrogation, the defendant is entitled (on request) to a jury instruction advising that the State's

give a *DiGiambattista* instruction, but informed counsel that he also would inform the jury of the date the case was decided by the court because, in his words, "giving the date goes to the issue of bad faith or good faith by the police. . . . [I]f the jury is no[t] told that 2004 was the date of the *DiGiambattista* decision, then [the jury would believe that the police] in essence disobeyed the [Supreme Judicial Court], the highest court of the land [*sic*] and that's not what happened. So I am going to give the date [of the decision as 2004]." Over defendant's objection the judge instructed the jury as follows:

> "*In 2004, which was subsequent to the statement at issue here*, the [S]tate's highest court expressed a preference that custodial interrogations be recorded whenever practicable. Because of the absence of any recording of the interrogation in this case, you should weigh evidence of the defendant's alleged statement with great caution and care. *The absence of the recording permits, but does not compel, you to conclude that the Commonwealth has failed to prove voluntariness beyond a reasonable doubt.*"

(Emphasis supplied.)

The defendant argues that the judge committed error by ignoring the court's instruction in *DiGiambattista* to give the instruction without regard to the alleged reasons for not recording the interrogation. We agree.

In *DiGiambattista*, the court clearly stated that "[i]t is of course permissible for *the prosecution* to address any reasons or justifications that would explain why no recording was made, leaving it to the jury to assess the weight they should give the lack of recording" (emphasis supplied). *Id.* at 448-449. Here, the judge erred in providing the jury with a reason or justification for the failure of the police to record the interview. The judge also erred in instructing the jury that, at the time the defendant was interviewed, the police were not on notice of the

highest court has expressed a preference that such interrogations be recorded whenever practicable, and cautioning the jury that, because of the absence of any such recording of the interrogation in the case before them, they should weigh evidence of the defendant's alleged statement with great caution and care." 442 Mass. at 447-448.

court's preference for recording such conversations. The court stated in *DiGiambattista, supra* at 441:

> "*Eight years ago this court announced that,* although failure to record an interrogation would not result in automatic suppression of a defendant's statement, *the lack of a recording was itself a relevant factor to consider on the issue of voluntariness and waiver. Commonwealth* v. *Diaz,* 422 Mass. 269, 273 (1996). . . . While we have to date stopped short of requiring electronic recording of interrogations as a constitutional or common-law prerequisite to the admissibility of any resulting statement by the defendant, *this court has repeatedly recognized the many benefits that flow from recording of interrogations.*"

(Emphasis supplied.)

Because the defendant filed a timely objection to the instruction, we review to determine whether the judge's instructions were prejudicial. An error is prejudicial to the defendant where "we cannot say that the error did not influence the jury, or had but a very slight effect." *Commonwealth* v. *Tavares,* 81 Mass. App. Ct. 71, 74 (2011), quoting from *Commonwealth* v. *McLaughlin,* 79 Mass. App. Ct. 670, 680 (2011).

We conclude that the error did not influence the jury, or had but slight effect, because the defendant challenges neither the accuracy nor the voluntariness of the statements alleged to have been made by him during the police interrogation. Rather, the defendant contends that his statements were ambiguous and that the State police should have asked him additional questions to clarify his answers.

The defendant further argues that the judge erred in providing the jury the supplemental *DiGiambattista* instruction given when voluntariness is an issue, and that the juxtaposition of the supplemental instruction improperly limited the reach of the instruction solely to the issue of voluntariness.[9] Voluntariness was not a live issue at trial, so that issue should not have been

---

[9] "[You] should weigh evidence of the defendant's alleged statement with great caution and care. . . . [T]he absence of the recording permits, but does not compel, you to conclude that the Commonwealth has failed to prove voluntariness beyond a reasonable doubt." See *DiGiambattista, supra* at 448.

submitted to the jury. See *Commonwealth* v. *Sheriff*, 425 Mass. 186, 193 (1997). However, we conclude that the erroneous supplemental instruction did not prejudice the defendant. Rather, the defendant received an additional instruction to which he was not entitled along with the proper cautionary instruction required by *DiGiambattista.*

4. *Jury instructions on joint venture and knowledge of a weapon.* At the conclusion of the judge's instructions to the jury, the defendant requested that, for joint venture, the jury be told that, in order to convict the defendant as a joint venturer, they must find that the defendant knew that the individual who assaulted the victim possessed a knife before the assault occurred. Such an instruction is required where the defendant is charged on a theory of joint venture for a crime that has possession of a weapon as one of its elements, see *Commonwealth* v. *Ellis*, 432 Mass. 746, 762 (2000), or in cases involving a theory of joint venture premeditated murder "during which another person carried and used the [weapon]." *Commonwealth* v. *Green*, 420 Mass. 771, 779 (1995), quoting from *Commonwealth* v. *Lydon*, 413 Mass. 309, 312 n.2 (1992).

Here, the jury rejected the Commonwealth's theory of premeditated murder, but returned a conviction for murder in the second degree. The jury were instructed properly on the mental state required for murder in the second degree, and in the circumstances of this case, the jury were warranted in concluding that the defendant shared the mental state needed to support the verdict.

*Judgment affirmed.*

BROWN, J. (dissenting). To paraphrase some of the language of the Reverend Dr. Martin Luther King, Jr., in his letter from Birmingham City Jail,[1] courts are thermostats, not thermometers. This is certainly an apt description of our role in the realm of

---

[1] Rev. Dr. Martin Luther King, Jr., Letter from Birmingham City Jail, April 16, 1963.

closing argument.[2] From the admonition in *Commonwealth* v. *Redmond*, 370 Mass. 591, 597 (1976), to the stern warnings in *Commonwealth* v. *Burnett*, 371 Mass. 13, 19 (1976), *Commonwealth* v. *Haas*, 373 Mass. 545, 557 & n.11 (1977), and *Commonwealth* v. *Smith*, 387 Mass. 900, 903-912 (1983), to the more recent case of *Commonwealth* v. *Beaudry*, 445 Mass. 577, 579-586 (2005), and those cases beyond, appellate courts have constantly demanded, albeit with minimal success, thoughtful and careful advance preparation. See, e.g., *Commonwealth* v. *Phoenix*, 409 Mass. 408, 426-428 (1991), and cases cited therein. Moreover, a "prosecutor's closing argument is a 'vulnerable area in which . . . an otherwise well-tried Commonwealth case' can be reversed" (citation omitted). *Commonwealth* v. *Smith*, *supra* at 913 n.2 (Abrams, J. concurring).

The toxic language here — "vetted by [the] grand jury" — was objected to by defense counsel, and the trial judge incorrectly overruled the objection and then went on unfortunately to bless this grossly unfair and unduly prejudicial assertion — one that was far beyond the permissible bounds of closing argument. Contrast *Commonwealth* v. *Westerman*, 414 Mass. 688, 700-701 (1993). In light of the defendant's objection and the judge's failure to correct this impermissible comment,[3] the defendant was so unduly prejudiced that he was deprived of a fair trial.

The defendant is entitled to a new and fairer trial. Fair trial means fair, i.e., as close to impeccable as possible. Cf. *Townsend* v. *Sain*, 372 U.S. 293 (1963).

This case turned, for the most part, on credibility. In short, the manner in which the prosecutor handled the issue of the witnesses' credibility was not only careless, but patently unfair. "As we have often said, the Commonwealth permissibly may

---

[2] "Defense counsel, likewise, are not immune from criticism; they too must adhere to proper professional and ethical standards. See, e.g., *Commonwealth* v. *Hogan*, 12 Mass. App. Ct. 646, 653 n.10 (1981). See also *Commonwealth* v. *Burno*, 18 Mass. App. Ct. 796, 797 n.1 (1984)." *Commonwealth* v. *McLeod*, 30 Mass. App. Ct. 536, 541 n.9 (1991). Defense counsel, as officers of the court, have an awesome responsibility that compels them to act fairly and responsibly in the performance of that role.

[3] Contrast in this regard *Commonwealth* v. *Ward*, 28 Mass. App. Ct. 292, 296 (1990); *Commonwealth* v. *O'Brien*, 56 Mass. App. Ct. 170, 173-175 (2002); *Commonwealth* v. *Vazquez*, 65 Mass. App. Ct. 305, 314 (2005).

play 'hard ball,' but 'foul' ball is inherently unfair and, of course, totally unacceptable." *Commonwealth* v. *Thomas*, 44 Mass. App. Ct. 521, 529 (1998) (Brown, J., dissenting in part).

Concluding as I do, I thus have no occasion to discuss the other claims of error.